[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11897

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 16, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00022-CV-WLS-1

CHARLES A. REHBERG,

Plaintiff-Appellee,

versus

JAMES P. PAULK,
in his individual capacity,
KENNETH B. HODGES, III,
in his individual capacity and
in his official capacity as District
Attorney of Dougherty County
KELLY R. BURKE, in his
individual capacity,

Defendants-Appellants,

DOUGHERTY COUNTY,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(July 16, 2010)

ON PETITION FOR PANEL REHEARING

Before CARNES, HULL and ANDERSON, Circuit Judges.

HULL, Circuit Judge:

Upon consideration of Plaintiff-Appellee's petition for rehearing and to the

extent it seeks panel rehearing, we vacate the prior opinion in this case, issued on

March 11, 2010 and published at 598 F.3d 1268 (11th Cir. 2010), and substitute

the following opinion in its place. Plaintiff-Appellee's petition for panel rehearing

is granted in part and denied in part.

In this § 1983 action, Plaintiff Charles Rehberg sued former District

Attorney Kenneth Hodges, specially appointed prosecutor Kelly Burke, and Chief

Investigator James Paulk, alleging federal claims for malicious prosecution,

retaliatory investigation and prosecution, evidence fabrication, and conspiracy to

violate Rehberg's constitutional rights. Defendants Hodges, Burke, and Paulk, in

their individual capacities, appeal the district court's denial of absolute and

qualified immunities. After review and oral argument, we affirm in part and

2

reverse in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

We review Rehberg's version of the events as alleged in his complaint, accepting them as true.[1]

### A.    The Investigation

From September 2003 to March 2004, Plaintiff Rehberg sent anonymous faxes to the management of Phoebe Putney Memorial Hospital (the "hospital"). The faxes criticized and parodied the management and activities of the hospital.

Defendant Hodges, then the District Attorney of Dougherty County, Georgia, and Defendant Paulk, the Chief Investigator in the District Attorney's Office, investigated Rehberg's actions as a "favor" to the hospital, to which Hodges and Paulk are alleged to have political connections.  Rehberg alleges Hodges and Paulk lacked probable cause to initiate a criminal investigation of him.

From October 2003 to February 2004, Defendants Hodges and Paulk prepared a series of subpoenas on Hodges's letterhead and issued the subpoenas to BellSouth and Alltel (later Sprint), requesting Rehberg's telephone records.  "Mr. Paulk also prepared and issued a subpoena to Exact Advertising, the Internet

_____

[1]In reviewing a Rule 12(b)(6) motion to dismiss, we accept as true the factual allegations in the complaint and all reasonable inferences therefrom.  Jackson v. Okaloosa County, Fla., 21 F.3d 1531, 1534 (11th Cir. 1994).

3

service provider of one of Mr. Rehberg's email accounts, and obtained Mr. Rehberg's personal e-mails that were sent and received from his personal computer." Compl. ¶ 37. Although no grand jury was impaneled at the time, the subpoenas purported to require appearance before a Dougherty County grand jury. Rehberg's case was not presented to a grand jury until December 14, 2005.

Defendant Paulk gave the results of the subpoenas, consisting of Rehberg's personal emails and phone records, to private civilian investigators, who allegedly directed the substance of the subpoenas. These civilian investigators paid the District Attorney's Office for Rehberg's information, often making payments directly to BellSouth and the other subpoenaed parties, allegedly to pay debts of the District Attorney's Office.

After receiving unfavorable press coverage of his relationships with the hospital, Hodges recused himself from prosecuting Rehberg. Burke was appointed a special prosecutor in Hodges's place. Hodges continued to supervise Paulk and remained in communication with Burke throughout the investigation, but he "never served as the actual prosecutor of the charges against Mr. Rehberg before the Grand Jury."

B. **First Indictment**

On December 14, 2005, a grand jury indicted Rehberg on charges of

4

aggravated assault, burglary, and six counts of "harassing phone calls." Burke was the prosecutor, and Paulk was the sole complaining witness against Rehberg before the grand jury. The first indictment alleged Rehberg assaulted Dr. James Hotz after unlawfully entering Dr. Hotz's home. In fact, Rehberg has never been to Dr. Hotz's home, and Dr. Hotz never reported an assault or burglary to law enforcement agencies. Paulk later admitted that he never interviewed any witnesses or gathered evidence indicating Rehberg committed an aggravated assault or burglary. And the alleged "harassing" phone calls to Dr. Hotz all were related to the faxes Rehberg had already sent criticizing the hospital.

The City of Albany Police Department[2] did not participate in the investigation. Paulk stated that he and Hodges initiated and handled the investigation on their own because they lacked confidence in the police department's ability to handle the investigation.

Rehberg contested the legal sufficiency of the first indictment. On February 2, 2006, Defendant Burke dismissed and nol-prossed the first indictment.

## C. Second Indictment

On February 15, 2006, Defendants Burke and Paulk initiated charges before a second grand jury. Paulk and Dr. Hotz appeared as witnesses. The grand jury

---

[2]The City of Albany, Georgia, is in Dougherty County.

issued a second indictment, charging Rehberg with simple assault against Dr. Hotz on August 22, 2004 and five counts of harassing phone calls.

Rehberg contested the sufficiency of the second indictment too. Rehberg alleged he was "nowhere near Dr. Hotz on August 22, 2004," and "[t]here was no evidence whatsoever that Mr. Rehberg committed an assault on anybody as he was charged." At a pretrial hearing on April 10, 2006, Defendant Burke announced the second indictment would be dismissed, but Burke did not dismiss it. On July 7, 2006, the state trial court ordered it dismissed.

## D. Third Indictment

On March 1, 2006, Defendants Burke and Paulk appeared before a third grand jury and secured a third indictment against Rehberg, charging him with simple assault and harassing telephone calls. At some unspecified time, Rehberg was arrested and briefly detained pursuant to an arrest warrant issued as a result of the second and third indictments.

On May 1, 2006, the state trial court issued two orders dismissing all charges against Rehberg because the third indictment did not sufficiently charge Rehberg with a criminal offense.

The three indictments against Rehberg were widely reported in the local press. Defendant Burke conducted interviews with the press and issued statements

saying: (1) "[I]t is never free speech to assault or harass someone, no matter who they are and no matter how much you don't like them," and (2) "It would be ludicrous to say that an individual has the right to go onto someone else's property and burn a cross under the guise of free speech, which is tantamount to what these defendants are claiming."

## E.    District Court Proceedings

Plaintiff Rehberg filed a verified complaint against Defendants Hodges, Burke, and Paulk, in their individual capacities.  Rehberg's complaint alleges ten counts, including these four federal § 1983 claims at issue in this appeal:[3] (1) malicious prosecution against Hodges and Paulk in violation of Rehberg's Fourth and Fourteenth Amendment rights (Count 6); (2) retaliatory investigation and prosecution against Hodges and Paulk, for their alleged retaliation against Rehberg because he exercised First Amendment free speech rights (Count 7); (3) participation in evidence fabrication, calling Paulk to give false testimony to the grand jury, and giving false statements to the media against Burke only (Count 8); and (4) conspiracy to violate Rehberg's constitutional rights under the First,

---

[3]Rehberg's complaint also alleges state-law claims for negligence (Counts 1 & 2) and invasion of privacy (Counts 3 & 4) against Paulk, which the district court refused to dismiss.  At this juncture, Defendant Paulk has not appealed the district court's rulings on those state-law claims.  At oral argument, counsel for Defendant Paulk confirmed to the Court that the state-law claims in Counts 1, 2, 3, and 4 against Paulk were not on appeal.

Fourth, and Fourteenth Amendments, against Hodges, Burke, and Paulk (Count 10).[4]

Defendants Hodges, Burke, and Paulk moved to dismiss these counts pursuant to Federal Rule of Civil Procedure 12(b)(6). They claimed absolute immunity, and, alternatively, qualified immunity. The district court denied the Defendants' motions.

Defendants Hodges, Burke, and Paulk, in their individual capacities, appeal the district court's denials of immunity as to Rehberg's above four federal constitutional claims.[5] We discuss absolute and qualified immunity and then Rehberg's claims.

## II. IMMUNITY LAW

### A. Absolute Immunity

Traditional common-law immunities for prosecutors apply to civil cases

---

[4]Plaintiff Rehberg also sued Dougherty County and Hodges, in his official capacity. Rehberg withdrew Count 5 against Dougherty County in response to its claim of sovereign immunity. Rehberg has not appealed the district court's dismissal of Count 9 against Dougherty County, which effectively dismissed Count 9 against Hodges because an official capacity claim against Hodges is another moniker for a claim against Dougherty County, Hodges's employer. See Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999). Thus only Counts 6, 7, 8, and 10 are involved in this appeal.

[5]The denial of absolute or qualified immunity on a motion to dismiss is an appealable interlocutory order. See Jones v. Cannon, 174 F.3d 1271, 1280-81 (11th Cir. 1999); Maggio v. Sipple, 211 F.3d 1346, 1350 (11th Cir. 2000) (citing Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817-18 (1985)). We review de novo the district court's denial of a motion to dismiss on the basis of absolute or qualified immunity. Maggio, 211 F.3d at 1350; Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001).

brought under § 1983. Imbler v. Pachtman, 424 U.S. 409, 427-28, 96 S. Ct. 984, 993-94 (1976). "[A]t common law, '[t]he general rule was, and is, that a prosecutor is absolutely immune from suit for malicious prosecution.'" Malley v. Briggs, 475 U.S. 335, 342, 106 S. Ct. 1092, 1097 (1986) (quoting Imbler, 424 U.S. at 437, 96 S. Ct. at 998). In § 1983 actions, prosecutors have absolute immunity for all activities that are "'intimately associated with the judicial phase of the criminal process.'" Van de Kamp v. Goldstein, __ U.S. __, 129 S. Ct. 855, 860 (2009) (quoting Imbler, 424 U.S. at 430, 96 S. Ct. at 995); accord Jones v. Cannon, 174 F.3d 1271, 1281 (11th Cir. 1999).

Absolute immunity does not depend entirely on a defendant's job title, but involves a functional approach granting immunity based on conduct. Jones, 174 F.3d at 1282. This functional approach looks to "the nature of the function performed, not the identity of the actor who performed it." Buckley v. Fitzsimmons, 509 U.S. 259, 269, 113 S. Ct. 2606, 2613 (1993); accord Imbler, 424 U.S. at 431 n. 33, 96 S. Ct. at 995 n. 33.

Absolute immunity accordingly applies to the prosecutor's actions "in initiating a prosecution and in presenting the State's case." Imbler, 424 U.S. at 431, 96 S. Ct. at 995. Prosecutors are immune for appearances in judicial proceedings, including prosecutorial conduct before grand juries, statements made

9

during trial, examination of witnesses, and presentation of evidence in support of a search warrant during a probable cause hearing. Burns v. Reed, 500 U.S. 478, 490-92, 111 S. Ct. 1934, 1942 (1991); Kalina v. Fletcher, 522 U.S. 118, 126, 118 S. Ct. 502, 507-08 (1997); see also Van de Kamp, 129 S. Ct. at 861. "A prosecutor enjoys absolute immunity from allegations stemming from the prosecutor's function as advocate." Jones, 174 F.3d at 1281. Such absolute immunity also "extends to a prosecutor's acts undertaken . . . in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." Id. (quotation marks omitted); accord Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1279-80 (11th Cir. 2002) (holding prosecutor who proffered perjured testimony and fabricated exhibits at trial is entitled to absolute immunity, but a prosecutor who participated in the search of a suspect's apartment is entitled to only qualified immunity).

If a prosecutor functions in a capacity unrelated to his role as an advocate for the state, he is not protected by absolute immunity but enjoys only qualified immunity. Kalina, 522 U.S. at 121, 118 S. Ct. at 505 (concluding prosecutor was acting as a witness in personally attesting to truth of averments in a "Certification for Determination of Probable Cause" for an arrest warrant and was not absolutely immune for that witness act, but that prosecutor was absolutely immune for

10

preparing and filing an "information charging respondent with burglary and a motion for an arrest warrant"); Buckley, 509 U.S. at 275-77, 113 S. Ct. at 2616-18 (concluding prosecutor's pre-indictment fabrication of third-party expert testimony linking defendant's boot to bootprint at murder scene and post-indictment participation in a press conference were not protected by absolute immunity); Burns, 500 U.S. at 496, 111 S. Ct. at 1944-45 (stating prosecutors do not enjoy absolute immunity for giving pre-indictment legal advice to the police). A prosecutor is not entitled to absolute immunity when he "performs the investigative functions normally performed by a detective or police officer." Buckley, 509 U.S. at 273, 113 S. Ct. at 2616; accord Jones, 174 F.3d at 1281-82 ("Although absolutely immune for actions taken as an advocate, the prosecutor has only qualified immunity when performing a function that is not associated with his role as an advocate for the state"); see also Malley, 475 U.S. at 340-41, 106 S. Ct. at 1096 (concluding police officer was not absolutely immune for drafting "felony complaints" with malice and without probable cause and submitting them in support of an application for arrest warrants).

B.   Qualified Immunity

Qualified immunity shields government officials who perform discretionary governmental functions from civil liability so long as their conduct does not violate

11

any "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). A government agent is entitled to immunity unless his act is "so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." Lassiter v. Ala. A&M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc).

To evaluate claims of qualified immunity, the Court considers whether (1) the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was "clearly established" at the time of the defendant's misconduct. This two-pronged analysis may be done in whatever order is deemed most appropriate for the case. Pearson v. Callahan, 555 U.S. ___, 129 S. Ct. 808, 821 (2009).

With this immunity background, we turn to Rehberg's claims.

### III. COUNT 6 – MALICIOUS PROSECUTION

Count 6 alleges Defendants Hodges and Paulk violated Rehberg's Fourth and Fourteenth Amendment rights through their "malicious prosecution" of him, resulting in his indictment and arrest.[6] Rehberg alleges that (1) Hodges and Paulk

---

[6]Rehberg alleges his arrest was an unreasonable seizure. The Fourth Amendment protection against "unreasonable" searches and seizures was made applicable to the States through the Fourteenth Amendment. Major League Baseball v. Crist, 331 F.3d 1177, 1179 n.4 (11th Cir. 2003).

knew there was no probable cause to indict him, and therefore they got together

with malice, fabricated evidence (i.e., Paulk's false testimony), and decided to

present that fabricated evidence to the grand jury; (2) Paulk, at Hodges's direction,

then testified falsely before the grand jury, resulting in Rehberg's indictment and

arrest; and (3) Hodges and Paulk invaded Rehberg's privacy by illegally issuing

subpoenas to BellSouth, Alltel, and Exact Advertising, without any pending

indictment and as a discovery device for private civilians.  We first discuss Paulk's

false testimony before the grand jury and then the Defendants' pre-indictment

conduct and subpoenas.

## A.    Paulk's Grand Jury Testimony

Even if Hodges and Paulk knew Paulk's testimony was false, Paulk receives

absolute immunity for the act of testifying to the grand jury.  Briscoe v. LaHue,

460 U.S. 325, 326, 103 S. Ct. 1108, 1111-12 (1983) (affirming that common-law

immunities granted to witnesses in judicial proceedings required giving absolute

immunity from § 1983 suit to police officer accused of giving false testimony at

trial); Burns, 500 U.S. at 492, 111 S. Ct. at 1942 (holding prosecutor was

absolutely immune for "appearance in court in support of an application for a

search warrant and the presentation of evidence at that hearing"); Jones, 174 F.3d

at 1288 ("[P]rosecutors and witnesses have absolute immunity for claims of

13

conspiracy to commit perjury based on a witness's allegedly false testimony at trial, before a grand jury, or at a post-conviction hearing."); Strength v. Hubert, 854 F.2d 421, 422-24 (11th Cir. 1988) (concluding investigator for state Attorney General's office received absolute immunity for false testimony to a grand jury, at which the defendant investigator was the sole witness);[7] Kelly v. Curtis, 21 F.3d 1544, 1553 (11th Cir. 1994) (holding detective immune for grand jury testimony).

We recognize that Plaintiff Rehberg alleges Defendant Paulk was the sole "complaining witness" before the grand jury. However, in Jones, "we expressly reject[ed] carving out an exception to absolute immunity for grand jury testimony, even if false and even if [the detective] were construed to be a complaining witness." Jones, 174 F.3d at 1287 n.10; see Rowe, 279 F.3d at 1285 (stating Jones "reject[ed] an exception for the testimony of 'complaining witnesses'"). In Jones, this Court aligned itself with the Third Circuit's decision in Kulwicki v. Dawson, 969 F.2d 1454, 1467 n.16 (3d Cir. 1992), which rejected the "complaining witness" exception to absolute immunity for false grand jury testimony. Jones, 174 F.3d at 1287 n.10. The Jones Court reasoned that allowing civil suits for false grand jury testimony would result in depositions, emasculate the confidential nature of grand jury testimony, and eviscerate the traditional absolute immunity for

---

[7]Overruled on other grounds, Whiting v. Traylor, 85 F.3d 581 (11th Cir. 1996).

14

witness testimony in judicial proceedings:

> [T]his case vividly illustrates the serious problems with
> carving out such an exception and imposing civil liability
> for . . . false testimony deceiving the grand jury. To
> prove or to defend against such a claim would necessitate
> depositions from the prosecutor, the grand jury witnesses,
> and the grand jury members . . . [which], in effect, would
> emasculate both the absolute immunity for grand jury
> testimony and the confidential nature of grand jury
> proceedings. The remedy for false grand jury testimony
> is criminal prosecution for perjury and not expanded civil
> liability and damages.

Jones, 174 F.3d at 1287 n.10.[8] And the Supreme Court "consistently ha[s]

recognized that the proper functioning of our grand jury system depends upon the

secrecy of grand jury proceedings." United States v. Sells Eng'g, Inc., 463 U.S.

418, 424, 103 S. Ct. 3133, 3138 (1983) (quotation marks omitted). Based on

Jones, we reject Rehberg's "complaining witness" exception to absolute immunity

for false grand jury testimony.[9]

---

[8]In Mastroianni v. Bowers, 173 F.3d 1363 (11th Cir. 1999), this Court declined to decide
whether to adopt a "complaining witness" exception because there was no factual finding in that
case that the defendant Georgia Bureau of Investigation officer was equivalent to a "complaining
witness." Id. at 1367 n.1. So Mastroianni did not answer the question presented here, but Jones
did.

[9]Two circuits carved out a complaining-witness exception to absolute immunity for false
grand jury testimony. See, e.g., Harris v. Roderick, 126 F.3d 1189, 1199 (9th Cir. 1997) (Deputy
U.S. Marshals not absolutely immune for false testimony before a grand and petit jury); White v.
Frank, 855 F.2d 956 (2d Cir. 1988) (police officer, as the "complaining witness," was not
absolutely immune for false grand jury testimony). These decisions rely on Malley v. Briggs,
475 U.S. at 340, 106 S. Ct. at 1096, which concluded that a police officer did not receive
absolute immunity for drawing up "felony complaints" with malice and without probable cause
and submitting them in support of an application for arrest warrants. The Supreme Court held

15

**B.     Hodges and Paulk's Pre-Indictment Investigation**

Distilled to its essence, Defendants' alleged pre-indictment conduct (excepting the subpoenas) is this:  Hodges and Paulk, acting as investigators, got together as a favor to the hospital, with malice and without probable cause, and made up a story about Rehberg, and then Paulk (at Hodges's direction) told that fake story under oath to the grand jury, leading to Rehberg's indictment and arrest. We already determined supra that Paulk receives absolute immunity for the actual grand jury testimony itself.  The question before us now is whether absolute immunity applies to the alleged conspiracy decision in the investigative stage to make up and present Paulk's false testimony to the grand jury.  Our precedent answers this question too.  See Mastroianni, 173 F.3d at 1367; Rowe, 279 F.3d at 1282; Jones, 174 F.3d at 1289.

In Mastroianni, the plaintiff alleged defendant Yeomans, a Georgia Bureau of Investigation agent, "engaged in a pretestimonial conspiracy to present false evidence, for which neither absolute nor qualified immunity is available."

_____

similarly in Kalina v. Fletcher, 522 U.S. at 120, 129-31, 118 S. Ct. at 505, 509-10, finding a prosecutor was not absolutely immune for acting as a witness in personally attesting to the truth of averments in a certification affidavit supporting an application for probable cause for an arrest warrant.

Acknowledging White v. Frank relies on Malley, the Jones Court noted that carving out an immunity exception for grand jury testimony would eviscerate the secrecy of grand jury proceedings, a concern not implicated by the "felony complaints" filed to support an arrest warrant in Malley and the personal certification for an arrest warrant in Kalina.

16

Mastroianni, 173 F.3d at 1367. This Court first stressed that "a witness has absolute immunity from civil liability based on his grand jury testimony. See Strength, 854 F.2d at 425, relying on Briscoe v. La Hue, 460 U.S. 325, 103 S. Ct. 1108 [ ] (1983)." Id. The Mastroianni Court then pointed out that while the plaintiff "contend[ed] that Yeomans committed numerous acts in furtherance of a conspiracy to present false testimony before the grand jury convened, the record itself support[ed] such an inference only if we consider as evidence Yeomans' testimony as it relates back to Yeomans' pretestimonial acts and statements." Mastroianni, 173 F.3d at 1367. In other words, because the only evidence to show a conspiracy in the pre-indictment phase was Yeomans's later false grand jury testimony, and because Yeomans was immune for that testimony, we concluded that Yeomans was absolutely immune for conspiracy to present or give grand jury testimony. Id. ("Because we may not consider such testimony as a factor upon which to base Yeomans' potential liability, we conclude that Yeomans is entitled to absolute immunity for his actions in this case").

This Court subsequently applied Mastroianni in Jones and Rowe, in each case concluding that absolute immunity applied equally both to the false testimony itself and to the alleged conspiracies to present false testimony. Jones, 174 F.3d at 1289 ("To allow a § 1983 claim based on subornation of perjured testimony where

17

the allegedly perjured testimony itself is cloaked in absolute immunity would be to permit through the back door what is prohibited through the front"); Rowe, 279 F.3d at 1282 ("It would be cold comfort for a prosecutor to know that he is absolutely immune from direct liability for actions taken as prosecutor, if those same actions could be used to prove him liable on a conspiracy theory involving conduct for which he was not immune").

Since Paulk receives absolute immunity for his false testimony before the grand jury, Hodges and Paulk are similarly immune for their alleged conspiracy to fabricate and present false testimony to the grand jury. Rowe, 279 F.3d at 1282 ("[A] witness's absolute immunity from liability for testifying forecloses any use of that testimony as evidence of the witness's membership in a conspiracy prior to his taking the stand").

It is important to point out that Hodges and Paulk generally would not receive absolute immunity for fabricating evidence, because investigating and gathering evidence falls outside the prosecutor's role as an advocate. See Buckley, 509 U.S. at 262-64, 113 S. Ct. at 2610-11 (no immunity for prosecutor who fabricated expert testimony linking defendant's boot with bootprint at murder scene); Rowe, 279 F.3d at 1281 (no immunity for fabrication of jump rope); Jones, 174 F.3d at 1289-90 (no immunity for fabrication of bootprint); Riley v. City of

18

Montgomery, Ala., 104 F.3d 1247, 1253 (11th Cir. 1997) (no immunity for police officer's planting of cocaine). All of these cases involved a particular discrete item of physical or expert evidence that was falsely created during the investigative stage to link the accused to a crime.

In contrast, there is no allegation of any physical or expert evidence that Hodges or Paulk fabricated or planted. There is no allegation of a pre-indictment document such as a false affidavit or false certification. Rather, Hodges and Paulk are accused of fabricating together only the testimony Paulk later gave to the grand jury. No evidence existed until Paulk actually testified to the grand jury. Stated differently, the only evidence Rehberg alleges was fabricated is Paulk's false grand jury testimony, for which Paulk receives absolute immunity.[10]

For all these reasons, we conclude Hodges and Paulk are entitled to absolute immunity for the pre-indictment conduct of conspiring to make up and present Paulk's false testimony to the grand jury.

## C. Subpoenas During Investigation

Rehberg's allegations regarding the subpoenas to his telephone and Internet

---

[10]Rehberg does not allege, for instance, that Hodges and Paulk fabricated physical evidence linking him to Dr. Hotz's house or convinced another witness to testify falsely about Rehberg's involvement. The only evidence presented to the grand jury was Paulk's testimony and Dr. Hotz's testimony (which Rehberg does not allege was false).

providers all recount pre-indictment investigative conduct by Hodges and Paulk.[11]

A prosecutor loses the cloak of absolute immunity by stepping out of his role as an

advocate and performing "investigative" functions more commonly performed by

law enforcement officers. Buckley, 509 U.S. at 273, 113 S. Ct. at 2616; Burns,

500 U.S. at 496, 111 S. Ct. at 1944-45; Rowe, 279 F.3d at 1280; Jones, 174 F.3d at

1285. Hodges and Paulk accordingly do not receive absolute immunity for

preparing and filing subpoenas during the investigation of Rehberg.

Hodges and Paulk may, however, receive qualified immunity if Rehberg's

subpoena allegations either do not state a constitutional violation or do not state a

constitutional violation that was clearly established. Pearson, 129 S. Ct. at 815-16,

821-22. Rehberg claims the subpoenas violated his Fourth Amendment right to be

free of unreasonable search and seizure.[12]

In order for Fourth Amendment protections to apply, the person invoking the

protection must have an objectively reasonable expectation of privacy in the place

searched or item seized. Minnesota v. Carter, 525 U.S. 83, 88, 119 S. Ct. 469, 473

(1998); Katz v. United States, 389 U.S. 347, 353, 88 S. Ct. 507, 512 (1967). To

---

[11]Rehberg's complaint does not allege Defendant Burke participated in the issuance of the subpoenas.

[12]The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.

establish a reasonable expectation of privacy, the person must show (1) that he manifested "a subjective expectation of privacy" in the item searched or seized, and (2) a willingness by society "to recognize that expectation as legitimate." United States v. McKennon, 814 F.2d 1539, 1543 (11th Cir. 1987).

The Supreme Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." Smith v. Maryland, 442 U.S. 735, 743-44, 99 S. Ct. 2577, 2582 (1979). "[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." United States v. Miller, 425 U.S. 435, 443, 96 S. Ct. 1619, 1624 (1976).

More specifically, a person does not have a legitimate expectation of privacy in numerical information he conveys to a telephone company in the ordinary course of business. Smith, 442 U.S. at 743-44, 99 S. Ct. at 2582 ("[E]ven if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not one that society is prepared to recognize as reasonable") (quotation marks omitted); accord United States v. Thompson, 936 F.2d 1249, 1250 (11th Cir. 1991) ("The Supreme Court has held

that the installation of a pen register does not constitute a search under the Fourth Amendment of the Constitution and does not warrant invocation of the exclusionary rule.").

Here, Rehberg lacked a legitimate expectation of privacy in the phone and fax numbers he dialed. Once he voluntarily provided that information to BellSouth and Alltel (later Sprint), Rehberg lacked any further valid expectation that those third parties would not turn the information over to law enforcement officers. Absent a valid right of privacy, Rehberg cannot state a constitutional violation regarding the subpoenas for his phone and fax information, and Paulk and Hodges accordingly are entitled to qualified immunity for issuing those subpoenas to BellSouth and Alltel.

This case presents a closer question over whether Paulk violated Rehberg's Fourth Amendment rights by issuing a subpoena to Rehberg's Internet Service Provider ("ISP") and obtaining "Mr. Rehberg's personal e-mails that were sent and received from his personal computer." Compl. ¶ 37. This is a question of first impression in this Circuit. Thus, we examine how other circuits have considered privacy rights in email material, such as email addresses, Internet subscriber information, and the contents of emails stored either on an ISP server or on a private computer/server, or both.

Several circuits have concluded that a person lacks legitimate privacy

expectations in Internet subscriber information and in to/from addresses in emails

sent via ISPs. See, e.g., United States v. Perrine, 518 F.3d 1196, 1204-05 (10th

Cir. 2008) ("Every federal court to address this issue has held that subscriber

information provided to an internet provider is not protected by the Fourth

Amendment's privacy expectation") (collecting cases from the Fourth, Sixth, and

Ninth Circuits and district courts in West Virginia, Massachusetts, Connecticut,

Maryland, New York, and Kansas); United States v. Forrester, 512 F.3d 500, 510

(9th Cir. 2008) ("[E]-mail and Internet users have no expectation of privacy in the

to/from addresses of their messages or the IP addresses of the websites they visit

because they should know that this information is provided to and used by Internet

service providers for the specific purpose of directing the routing of information.").

To date only a few circuit decisions address the issue of Fourth Amendment

protection of email content. Some circuit decisions suggest in dicta that a person

loses a legitimate expectation of privacy in emails sent to and received by a third-

party recipient. In Guest v. Leis, 255 F.3d 325, 333 (6th Cir. 2001), the Sixth

Circuit noted that Internet bulletin board users lack a valid Fourth Amendment

expectation of privacy in materials they voluntarily posted to a public Internet

bulletin board. Id. The Sixth Circuit reasoned that a person would lose a

legitimate expectation of privacy in a sent email that had already reached its

recipient, analogizing an emailer to a letter-writer, whose "'expectation of privacy

ordinarily terminates upon delivery'" of a letter.  Id. (quoting United States v.

King, 55 F.3d 1193, 1196 (11th Cir. 1995)).  Ultimately, however, the Sixth

Circuit did not resolve this constitutional question because it determined that the

plaintiffs had not shown a genuine issue of fact over whether the defendants

actually searched their emails, and thus could not show a Fourth Amendment

violation even assuming a privacy right had been violated.  Id. at 335.[13]

In United States v. Lifshitz, 369 F.3d 173, 190 (2d Cir. 2004), the Second

Circuit cited Guest and noted that the defendant, who challenged the

constitutionality of a probation condition allowing monitoring of his computer,

"may not [] enjoy [] an expectation of privacy in transmissions over the Internet or

e-mail that have already arrived at the recipient."  Id.  However, the Second Circuit

---

[13]Plaintiff Rehberg points to Warshak v. United States, 490 F.3d 455 (6th Cir. 2007), reh'g en banc granted, opinion vacated (6th Cir. Oct. 9, 2007) (criminal investigation of plaintiff), in which a Sixth Circuit panel concluded "that individuals maintain a reasonable expectation of privacy in e-mails that are stored with, or sent or received through, a commercial ISP."  Id. at 473.  In reaching this conclusion, the Sixth Circuit panel distinguished its circuit precedent in Guest:  "Although we stated that an e-mail sender would 'lose a legitimate expectation of privacy in an e-mail that had already reached its recipient,' analogizing such an e-mailer to 'a letter-writer,' this diminished privacy is only relevant with respect to the recipient, as the sender has assumed the risk of disclosure by or through the recipient. [Guest, 255 F.3d] at 333.  Guest did not hold that the mere use of an intermediary such as an ISP to send and receive e-mails amounted to a waiver of a legitimate expectation of privacy."  Id. at 472.  The Sixth Circuit en banc subsequently vacated the Warshak opinion because the criminal investigation was over, there was no ongoing possibility of a Fourth Amendment violation, and thus the case was not ripe.  Warshak v. United States, 532 F.3d 521 (6th Cir. 2008).

24

ultimately noted that as a probationer, the defendant would be subject to a reduced expectation of privacy. The Second Circuit thus did not issue a constitutional holding on the privacy rights of private citizens in email content. Id.

The Supreme Court has not yet addressed the question of privacy rights in email material. Plaintiff Rehberg thus relies on Supreme Court precedent on privacy rights accorded to the contents of telephone communications. In Katz, the Supreme Court first recognized a privacy expectation in the contents of a telephone conversation in a closed public phone booth. Katz, 389 U.S. at 353, 88 S. Ct. at 512. In Smith v. Maryland, the Supreme Court refined that privacy expectation, noting the distinction between the contents of a telephone call (for which a legitimate privacy expectation exists) and the actual phone numbers dialed (no privacy expectation). 442 U.S. at 743-44, 99 S. Ct. at 2582.

The Supreme Court's more-recent precedent shows a marked lack of clarity in what privacy expectations as to content of electronic communications are reasonable. In City of Ontario v. Quon, No. 08-1332, slip. op., 78 U.S.L.W. 4591 (U.S. June 17, 2010), the Supreme Court reversed the Ninth Circuit's decision that held a government employee had a reasonable expectation of privacy in text messages sent and received by a third party. The plaintiff police sergeant sued the City for violating his Fourth Amendment rights by obtaining and reviewing

25

transcripts of personal text messages he sent and received from a pager that was owned by the City and issued to him for work use. Id. at 1, 5. The parties disputed whether the plaintiff, as a public employee, had an objectively reasonable expectation of privacy in those text messages. Id. at 9-10.

Even after the briefs of 2 parties and 10 amici curiae, the Supreme Court declined to decide whether the plaintiff's asserted privacy expectations were reasonable. Id. at 9, 11-12. The Supreme Court acknowledged that the case "touches issues of far-reaching significance." Id. at 1. After remarking that it "must proceed with care when considering the whole concept of privacy expectations in communications made on electronic equipment owned by a government employer," the Supreme Court cautioned that "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." Id. at 10. The Supreme Court explained: "In Katz, the Court relied on its own knowledge and experience to conclude that there is a reasonable expectation of privacy in a telephone booth." Id. In contrast, the Supreme Court found "[i]t is not so clear that courts at present are on so sure a ground" as to electronic devices. Id. Therefore, the Supreme Court admonished that "[p]rudence counsels caution before the facts in the instant case are used to establish far-reaching premises that define the existence, and

26

extent, of privacy expectations" in communications on electronic devices. Id. The

Supreme Court specifically noted that ongoing "[r]apid changes in the dynamics of

communication and information transmission" caused similar rapid change "in

what society accepts as proper behavior." Id. at 11.

To underscore its disinclination to establish broad precedents as to privacy

rights vis-a-vis electronic devices and emerging technologies, the Supreme Court

explained the difficulty in determining what privacy expectations are reasonable,

stating:

> [T]he Court would have difficulty predicting how
> employees' privacy expectations will be shaped by those
> changes or the degree to which society will be prepared
> to recognize those expectations as reasonable. Cell
> phone and text message communications are so pervasive
> that some persons may consider them to be essential
> means or necessary instruments for self-expression, even
> self-identification. That might strengthen the case for an
> expectation of privacy. On the other hand, the ubiquity
> of those devices has made them generally affordable, so
> one could counter that employees who need cell phones
> or similar devices for personal matters can purchase and
> pay for their own. And employer policies concerning
> communications will of course shape the reasonable
> expectations of their employees, especially to the extent
> that such policies are clearly communicated.

Id. at 11. The Supreme Court again eschewed "a broad holding," finding it

"preferable to dispose of this case on narrower grounds" and "settled principles."

Id. at 1, 11-12. It declined to answer the constitutional question of whether the

27

plaintiff's privacy expectation was reasonable or even to set forth the governing principles to answer that question. Instead, the Supreme Court (1) assumed arguendo that plaintiff Quon had a reasonable expectation of privacy, (2) assumed that the government's review of a transcript of his text messages was a search under the Fourth Amendment, and even (3) assumed principles governing a search of physical office applied to "the electronic sphere." Id. at 12. It then concluded that the plaintiff's government employer did not violate the Fourth Amendment because its review of his personal text messages on a government-owned pager was reasonable and motivated by a legitimate work-related purpose. Id. at 12, 16-17 (citing O'Connor v. Ortega, 480 U.S. 709, 725, 107 S. Ct. 1492, 1502 (1987)).

As these varied cases suggest, the questions of whether Fourth Amendment principles governing a search of Rehberg's home also should apply to subpoenas sent to a third-party ISP for electronic data stored on the third-party's server, and whether Rehberg had a reasonable privacy expectation in the contents of his personal emails sent voluntarily through that third-party ISP, are complex, difficult, and "far-reaching" legal issues that we should be cautious about resolving too broadly. As the Supreme Court advised us, "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." Id. at 10. Given the lack

28

of precedent, we now question whether it would be prudent in this case and on this limited factual record to establish broad precedent as to the reasonable privacy expectation in email content. Moreover, because this is a qualified immunity case, we need not reach the underlying constitutional issue. Instead, we can resolve this case narrowly, cf. id. at 1, because at a minimum Rehberg has not shown his alleged constitutional right was clearly established.[14]

In determining whether a constitutional right was clearly established at the time of violation, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001); see also Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002) ("the salient question . . . is whether the state of the law [at the time of violation] . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was

---

[14]In his petition for panel rehearing, Rehberg also tangentially mentions the Stored Communications Act ("SCA"), 18 U.S.C. § 2703, et seq., which provides the government a mechanism to require the provider of a remote computing service to disclose the contents of wire or electronic communications upon issuance of a warrant or court order. Pet. for Reh'g at 4 n.2, 10. Rehberg seemingly argues that a violation of this Act implies a violation of his constitutional rights. However, Rehberg did not assert an SCA claim in the district court or in his appellate brief, so we decline to address it further. Tanner Adver. Group, L.L.C. v. Fayette County, 451 F.3d 777, 785 (11th Cir. 2006) ("'The law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.'" (quoting Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004)) (brackets omitted)); see also Snow v. DirecTV, Inc., 450 F.3d 1314, 1321 (11th Cir. 2006) ("a valid civil complaint under the SCA must allege a violation of one of its provisions").

29

unconstitutional").[15]

No Supreme Court decision and no precedential decision of this Circuit defines privacy rights in email content voluntarily transmitted over the global Internet and stored at a third-party ISP. See Quon, slip op. at 9-10. As a result, Paulk could not have known the scope of the privacy rights, if any, that Rehberg had in email content stored at his third-party ISP.[16] The Supreme Court's decisions in Katz and Smith clearly established an objectively reasonable privacy right in telephone conversation content, but, as the modern Internet did not exist at the time of those decisions, whether the analytical framework, much less the rationale, of those decisions transfers to privacy rights in Internet email is questionable and far from clearly established. Indeed, in Quon, the Supreme Court only assumed, without deciding, that the Fourth Amendment framework for analyzing physical

---

[15]This fair and clear notice requirement may be met in three ways: (1) the words of the pertinent federal statute or constitutional provision may be so specific as to clearly establish the law even in total absence of judicial decisions interpreting the law, Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002); (2) "some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts," id. at 1351; and (3) most commonly, when we lack explicit statutory or constitutional pronouncements and broad case holdings, we look to precedential cases that are tied to their particular facts. Id. at 1351-52. When caselaw is needed, we look to decisions of the U.S. Supreme Court, this Court, and, where applicable, the highest court of the pertinent state. Marsh v. Butler County, Ala., 268 F.3d 1014, 1032-33 n.10 (11th Cir. 2001).

[16]There is no allegation, for instance, that the Defendants searched Rehberg's home computer or even his entire email account. The Complaint alleges only that Paulk subpoenaed and accessed email messages actually sent and received through Rehberg's ISP. An email draft never sent by Rehberg to his ISP would not have been within the scope of the subpoena.

searches applied to searches in the "electronic sphere." Id. at 12. In contrast, Rehberg has not identified any judicial decision holding a government agent liable for Fourth Amendment violations related to email content received by a third party and stored on a third party's server.

Because the federal law was not clearly established, the district court erred in denying qualified immunity to Paulk on Rehberg's email subpoena claim.[17]

## IV. COUNT 7 – RETALIATORY PROSECUTION

In Count 7, Rehberg alleges Hodges and Paulk violated his First Amendment free speech rights by retaliating against him for his criticism of the hospital in his faxes. Rehberg alleges Hodges's and Paulk's decisions to investigate him, issue subpoenas, provide his information to paid civilians, and procure wrongful indictments were in retaliation for his faxes and criticism of the

---

[17]Rehberg's § 1983 malicious prosecution claim in Count 6 requires proving both (1) the elements of the common-law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004); Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003). Rehberg alleges his arrest was an unlawful seizure, but he also appears to contend that the unlawful search of his phone records and emails also would support a malicious prosecution claim. We cannot locate any case where a search without a later arrest was sufficient to support a § 1983 malicious prosecution claim. However, because Rehberg has not shown the search of his phone records and emails violated clearly established federal law, we need not address the viability of Rehberg's malicious prosecution claims as to the subpoenas. Alternatively, if Rehberg is attempting to assert only an independent Fourth Amendment claim (and not a malicious prosecution claim) as to the subpoenas, Rehberg also has not shown the violation of clearly established federal law.

hospital and were all made without probable cause.[18]

We first review Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695 (2006), which addresses retaliatory-prosecution claims.

## A.    Hartman v. Moore

In Hartman, plaintiff Moore brought a Bivens[19] action against postal inspectors and a federal prosecutor for retaliatory prosecution.[20]  Because of Moore's criticism of and lobbying to the U.S. Postal Service, postal inspectors launched criminal investigations against Moore and pressured the United States Attorney's Office to indict him, "[n]otwithstanding very limited evidence."  Id. at 253-54, 126 S. Ct. at 1699-1700.  Although they did not testify, the postal inspectors drafted "witness statements" for other witnesses and provided them to the prosecutor, who presented them to the grand jury.  Moore v. United States, 213 F.3d 705, 707 (D.C. Cir. 2000).  The district court dismissed the criminal charges

---

[18]To the extent Rehberg relies on the Fourth Amendment, "there is no retaliation claim under the Fourth Amendment separate and distinct from [Rehberg's] malicious prosecution . . . claim[]."  Wood, 323 F.3d at 883.  "Instead, the only cause of action for retaliation that arguably applies here is retaliatory prosecution in violation of the First Amendment."  Id.

[19]See Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S. Ct. 1999 (1971).

[20]Moore's company manufactured a multiline optical character reader useful in sorting mail.  Hartman, 547 U.S. at 252, 126 S. Ct. at 1699.  He lobbied the U.S. Postal Service to purchase multiline readers and criticized its reliance on single-line readers.  Id. at 253, 126 S. Ct. at 1699.

against Moore for a "complete lack of direct evidence." Hartman, 547 U.S. at 254, 126 S. Ct. at 1700.

In Moore's subsequent Bivens action for retaliatory prosecution, the district court granted absolute immunity to the prosecutor but denied qualified immunity to the postal inspectors. Id. at 255, 126 S. Ct. at 1701. As to the prosecutor, the D.C. Circuit affirmed absolute immunity for the retaliatory decision to prosecute Moore and the prosecutor's concealment of exculpatory evidence from the grand jury, manipulation of evidence before the grand jury, and failure to disclose exculpatory material before trial. Moore, 213 F.3d at 708. As to the postal inspectors, the D.C. Circuit affirmed the denial of qualified immunity and allowed Moore's retaliatory-prosecution claim to proceed against them, even though Moore had not shown an absence of probable cause for the criminal charges against him.

In reversing the D.C. Circuit's denial of qualified immunity to the postal inspectors, the Supreme Court in Hartman concluded that to bring a retaliatory-prosecution claim, the plaintiff must show an absence of probable cause for the prosecution. Hartman, 547 U.S. at 252, 126 S. Ct. at 1699. The Supreme Court first noted, "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Id. at 256, 126 S. Ct. at 1701 (citations and

quotation marks omitted).  The Supreme Court, however, explained that a

retaliatory-prosecution suit cannot be brought against the prosecutor, but only

against the "non-prosecuting official" who successfully induced the prosecutor to

bring charges that would not otherwise have been brought, as follows:

> A Bivens (or § 1983) action for retaliatory prosecution
> will not be brought against the prosecutor, who is
> absolutely immune from liability for the decision to
> prosecute.  Instead, the defendant will be a
> nonprosecutor, an official, like an inspector here, who
> may have influenced the prosecutorial decision but did
> not himself make it, and the cause of action will not be
> strictly for retaliatory prosecution, but for successful
> retaliatory inducement to prosecute.  The consequence is
> that a plaintiff like Moore must show that the
> nonprosecuting official acted in retaliation, and must also
> show that he induced the prosecutor to bring charges that
> would not have been initiated without his urging.

Id. at 261-62, 126 S. Ct. at 1704-05 (emphasis added).  To sue for retaliatory

prosecution, a plaintiff must establish a "but-for" causal connection between the

retaliatory animus of the non-prosecutor and the prosecutor's decision to prosecute.

See id. at 256, 261, 126 S. Ct. at 1701, 1704 (discussing "but-for cause" and "but-

for basis" for the prosecutor's decision to prosecute).[21]

And Hartman indicates that to establish a prima facie case of this but-for

---

[21]In a footnote, the Supreme Court noted that Moore's complaint charged the prosecutor with acting in both an investigatory and prosecutorial capacity, but that no appeal or claim against the prosecutor was before the Supreme Court.  Hartman, 547 U.S. at 262 n.8, 126 S. Ct. at 1705 n.8.

34

causal connection, a plaintiff must plead and prove both (1) a retaliatory motive on the part of the non-prosecutor official, and (2) the absence of probable cause supporting the prosecutor's decision. Id. at 265, 126 S. Ct. at 1706; see also Wood, 323 F.3d at 883 (First Amendment retaliatory-prosecution claim is defeated by the existence of probable cause). A retaliatory motive on the part of a "non-prosecuting official" combined with an absence of probable cause will create "a prima facie inference that the unconstitutionally motivated inducement infected the prosecutor's decision to bring the charge." Hartman, 547 U.S. at 265, 126 S. Ct. at 1706. Importantly, the absence of probable cause "is not necessarily dispositive" of whether the unconstitutionally motivated inducement succeeded, but will create a prima facie inference that it did. Id. The burden then shifts to the defendant official to show "that the action would have been taken anyway, independently of any retaliatory animus." Id. at 261, 126 S. Ct. at 1704. In other words, the defendant official will not be liable if he can show the prosecutor would have taken the action complained of anyway. Id.

**B.    Rehberg's Retaliatory-Prosecution Claims**

Hartman dictates the outcome of Rehberg's retaliatory-prosecution claim in Count 7. First, as to Hodges, Rehberg alleges Hodges was in communication with Burke about the decision to prosecute, even after Hodges recused. Hodges's

alleged decision to prosecute Rehberg, even if made without probable cause and even if caused solely by Paulk's and his unconstitutional retaliatory animus, is protected by absolute immunity. Hartman, 547 U.S. at 261-62, 126 S. Ct. at 1704-05.

As to Paulk, Rehberg must show investigator Paulk's retaliation against Rehberg successfully induced the prosecution and was the "but-for" cause of the prosecution. Hartman, 547 U.S. at 265, 126 S. Ct. at 1701. Accordingly, Rehberg must show that prosecutor Burke (himself or with Hodges's influence) would not have prosecuted Rehberg but for Paulk's retaliatory motive and conduct.[22]

The very detailed allegations in Rehberg's complaint satisfy the two requirements for a prima facie case of retaliatory prosecution: non-prosecutor Paulk's retaliatory motive, and the absence of probable cause for prosecutor Burke to bring charges. Hartman, 547 U.S. at 265, 126 S. Ct. at 1706. For example, Rehberg alleges "[t]here was no probable cause for the underlying criminal charges against Mr. Rehberg and such charges would not have been brought if there was no retaliatory motive." Rehberg supports this alleged lack of probable cause by alleging Paulk admitted that "he never interviewed any witnesses or gathered any

_____

[22]Count 7 of Rehberg's complaint does not name Burke as a defendant, but Count 7 claims Paulk's retaliatory motive and actions "wrongfully influenced and instigated the prosecutorial decision to bring charges against Mr. Rehberg."

36

evidence indicating that Mr. Rehberg committed any aggravated assault or burglary," and Paulk's false testimony was the only evidence Burke presented in support of the first indictment. Without Paulk's allegedly false testimony, Burke could not have procured the first indictment because there was no other evidence. Rehberg also alleges Hodges and Paulk acted in retaliation for Rehberg's criticisms of the activities and financial management of a public hospital to which they had close political connections and personal relationships and that chilling Rehberg's speech was a motivating factor in all of Hodges's and Paulk's conduct in investigating and prosecuting him.

In sum, Rehberg sufficiently has alleged the requisite retaliatory motive, absence of probable cause, and but-for causation (i.e., that Burke would not have prosecuted Rehberg but for Paulk's false testimony). Therefore, at this pleading juncture, the district court did not err in denying absolute and qualified immunity to Defendant Paulk on Rehberg's retaliatory-prosecution claim.

## C.    Retaliatory Investigation Claim

Rehberg's complaint also alleges a "retaliatory investigation" claim against Hodges and Paulk. For example, Rehberg's complaint alleges Hodges and Paulk together decided to investigate Rehberg and took several steps during the investigation because each of them had retaliatory animus. These allegations of

coordinated and joint actions are replete throughout the complaint. E.g., Compl. ¶¶ 99 ("Mr. Paulk and Mr. Hodges instituted an investigation . . ."), 124 ("Chilling his political speech was a substantial or motivating factor in the wrongful conduct of Mr. Paulk and Mr. Hodges in investigating Mr. Rehberg . . ."), 157-61 (conspiracy claim).

Hartman does not help us with this claim because the Supreme Court pointedly did not decide whether "simply conducting retaliatory investigation with a view to promote prosecution is a constitutional tort." Hartman, 547 U.S. at 262 n. 9, 126 S. Ct. at 1705 n. 9 ("Whether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation is not before us").[23]

As noted above, only qualified immunity, not absolute immunity, applies to conduct taken in an investigatory capacity as opposed to a prosecutorial capacity. As we explain above, it was not clearly established that the subpoenas to Rehberg's phone and email providers violated his Fourth Amendment rights. We also are inclined to agree with the government that Hodges and Paulk's retaliatory animus does not create a distinct constitutional tort.[24]

---

[23]Rehberg does not allege he incurred any expenses in the investigation stage.

[24]The initiation of a criminal investigation in and of itself does not implicate a federal constitutional right. The Constitution does not require evidence of wrongdoing or reasonable suspicion of wrongdoing by a suspect before the government can begin investigating that

But even if we assume Rehberg has stated a constitutional violation by alleging that Hodges and Paulk initiated an investigation and issued subpoenas in retaliation for Rehberg's exercise of First Amendment rights, Hodges and Paulk still receive qualified immunity because Rehberg's right to be free from a retaliatory investigation is not clearly established. The Supreme Court has never defined retaliatory investigation, standing alone, as a constitutional tort, Hartman, 547 U.S. at 262 n.9, 126 S. Ct. at 1705 n.9, and neither has this Court. Without this sort of precedent, Rehberg cannot show that the retaliatory investigation alleged here violated his First Amendment rights. See Oliver v. Fiorino, 586 F.3d 898, 907 (11th Cir. 2009) ("In order to determine whether a right is clearly established, we look to the precedent of the Supreme Court of the United States, this Court's precedent, and the pertinent state's supreme court precedent, interpreting and applying the law in similar circumstances"). Hodges and Paulk accordingly are entitled to qualified immunity for Rehberg's retaliatory investigation claims in Count 7.

## V. COUNT 8 – FABRICATION OF EVIDENCE AND PRESS STATEMENTS AGAINST BURKE

Count 8 is against only Burke. Rehberg alleges Burke violated his

---

suspect. See United States v. Aibejeris, 28 F.3d 97, 99 (11th Cir. 1994). No § 1983 liability can attach merely because the government initiated a criminal investigation.

"constitutional rights" by (1) "participat[ing] in fabricating evidence"; (2) presenting Paulk's perjured testimony to the grand jury; and (3) making defamatory statements to the media which "damaged Mr. Rehberg's reputation."[25]

As a special prosecutor appointed to stand in for Hodges, Burke receives the full scope of absolute prosecutorial immunity and is absolutely immune for Rehberg's claims of malicious prosecution and the presentation of perjured testimony to a grand jury. For the same reasons explained above, Burke also is absolutely immune for participating in the conspiracy to fabricate Paulk's grand jury testimony against Rehberg.

Burke's statements to the media, however, are not cloaked in absolute immunity because "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor," and they are not part of the prosecutor's role as an advocate of the State. See Buckley, 509 U.S. at 277-78, 113 S. Ct. at 2618 ("The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions"); Hart v. Hodges, 587 F.3d 1288, 1297 (11th Cir. 2009). Burke's immunity for the alleged press statements must arise, if at all, through qualified immunity.

_____

[25]Burke is not alleged to have participated in subpoenaing Rehberg's telephone and Internet providers.

A tort claim, such as Rehberg's defamation allegation in Count 8, does not give rise to a § 1983 due process claim unless there is an additional constitutional injury alleged. Cypress Ins. Co. v. Clark, 144 F.3d 1435, 1438 (11th Cir. 1998). "The Supreme Court . . . held that injury to reputation, by itself, does not constitute the deprivation of a liberty or property interest protected under the Fourteenth Amendment." Behrens v. Regier, 422 F.3d 1255, 1259 (11th Cir. 2005) (citing Paul v. Davis, 424 U.S. 693, 701-02, 96 S. Ct. 1155, 1160-61 (1976)).[26] Damages to a plaintiff's reputation "are only recoverable in a section 1983 action if those damages were incurred as a result of government action significantly altering the plaintiff's constitutionally recognized legal rights." Cypress, 144 F.3d at 1438.

This doctrine is known as the "stigma-plus" test, Cannon v. City of W. Palm Beach, 250 F.3d 1299, 1302 (11th Cir. 2001), and requires the plaintiff to show both a valid defamation claim (the stigma) and "the violation of some more tangible interest" (the plus). Behrens, 422 F.3d at 1260 (quotation marks omitted). "To establish a liberty interest sufficient to implicate the fourteenth amendment safeguards, the individual must be not only stigmatized but also stigmatized in

_____

[26]Rehberg does not specifically identify what constitutional provision Burke's media statements violated. We assume Rehberg asserts a Fourteenth Amendment due process claim. See, e.g., Paul, 424 U.S. at 712, 96 S. Ct. at 1165-66; Cypress, 144 F.3d at 1436. Rehberg does not identify another constitutional theory that might support a § 1983 action for false statements to the media.

41

connection with . . . [a] government official's conduct [that] deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging the plaintiff's reputation." Id. (citations and quotation marks omitted).[27]  The "stigma-plus" test requires not only allegations stating a common-law defamation claim, but also an additional constitutional injury, tied to a previously recognized constitutional property or liberty interest, flowing from the defamation.  Cypress, 144 F.3d at 1436-37.

Rehberg's complaint alleges damage to his reputation but does not allege the required deprivation of any previously recognized constitutional property or liberty interest.  The only factual allegations Rehberg makes regarding Burke's media statements are these:  "Mr. Rehberg . . . was subjected to extensive publicity in the media where he was identified as being charged with multiple felonies and misdemeanors, and publicly identified by the acting District Attorney as having committed an assault and burglary.  The damage of three indictments on his public

---

[27]"While we have in a number of our prior cases pointed out the frequently drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." Paul, 424 U.S. at 701, 96 S. Ct. at 1160-61; see also Siegert v. Gilley, 500 U.S. 226, 234, 111 S. Ct. 1789, 1794 (1991) ("Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation.  But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a Bivens action.").

record will remain with him and his wife and children for the rest of their lives." He continues by alleging, "[t]hese wrongful indictments will always be associated with his name and have caused and will cause significant personal, professional and economic damages to Mr. Rehberg." Rehberg alleges Burke's media statements "wrongfully damaged [his] reputation."

In short, Rehberg's defamation allegations are too generalized to show a previously recognized constitutional deprivation flowing from Burke's alleged defamatory statements. Damage to reputation alone is insufficient to state a Fourteenth Amendment due process claim. Cypress, 144 F.3d at 1437-38 ("Indeed, [in Siegert v. Gilley, 500 U.S. 226, 111 S. Ct. 1789 (1991)] the [Supreme] Court specifically rejected the notion that defamation by a government actor that causes injury to professional reputation violates procedural due process").

The district court averted this settled law by connecting Burke's media statements to "the alleged Fourteenth Amendment violation alleged by Plaintiff, i.e., violation of his right to be free from prosecution based upon false evidence/charges." This was error. The "stigma-plus" test requires the plaintiff to show deprivation of a previously recognized Fourteenth Amendment property or liberty interest "in connection with" the claimed defamation. Even liberally

43

construed, Rehberg's complaint does not allege a procedural due process claim under the Fourteenth Amendment. See Albright v. Oliver, 510 U.S. 266, 272, 114 S. Ct. 807, 812 (1994). Rehberg does not allege Dougherty County or the individual defendants denied him the constitutionally required procedures necessary to challenge his indictments and arrest. Indeed, Rehberg's successful challenges to the three indictments show otherwise. And, under the Fourteenth Amendment, there is no substantive due process right to be free from malicious prosecution without probable cause. Id. at 274, 114 S. Ct. at 813. A malicious prosecution claim arises under the Fourth Amendment, not Fourteenth Amendment substantive due process.

Therefore, the only remaining "plus" Rehberg identifies is the right to be free from malicious prosecution and unreasonable detention under the Fourth Amendment. However, Rehberg's complaint does not allege that Burke's media statements caused Rehberg's indictments and arrest.[28] For example, there is no allegation that the grand jury relied on Burke's press statements in indicting Rehberg or that the Defendants relied on Burke's media statements as probable cause to arrest Rehberg. Paul's "stigma-plus" test is not satisfied by simply

[28]The complaint does not clearly state whether Burke made his media statements before Rehberg was indicted or after, but the complaint also does not allege any fact showing that Burke's media statements caused Rehberg to be indicted.

44

alleging a constitutional violation somewhere in the case.  The constitutional

violation must itself flow from the alleged defamation.[29]

In any event, Rehberg cannot use the prosecution itself (the indictment and

arrest) as the basis for constitutional injury supporting a § 1983 defamation claim.

The Seventh Circuit considered this precise situation, concluding the plaintiff must

point to some constitutional wrong, other than the indictment and related events, in

order to support a § 1983 constitutional claim based on defamation.  "Identifying

the arrest and imprisonment as the loss of liberty does not assist [the plaintiff],

however, because [the prosecutor] has absolute immunity from damages for these

events."  Buckley v. Fitzsimmons, 20 F.3d 789, 797 (7th Cir. 1994), cert. denied,

513 U.S. 1085, 115 S. Ct. 740 (1995) (rejecting plaintiff's arrest as a sufficient

"plus" under the stigma-plus test).  The Seventh Circuit explained that, "the

Supreme Court [] adopt[ed] a strict separation between the prosecutor's role as

advocate and the ancillary events (such as press conferences) surrounding the

prosecution.  It would be incongruous to treat the press conference and the

prosecution as distinct for purposes of immunity but not for purposes of defining

---

[29]The district court cited Riley v. City of Montgomery, Ala., 104 F.3d at 1253, for the proposition that fabricating evidence violates an accused's constitutional rights, and thus since Rehberg alleges fabrication in this case, he satisfied Paul's "stigma-plus" test.  Even assuming evidence was fabricated and that this fabrication was a constitutional violation, nothing in the complaint connects Hodges's and Paulk's alleged evidence fabrication to Burke's press statements.

the actionable wrong." Id. at 797-98. The Seventh Circuit concluded that, "a plaintiff who uses a 'stigma plus' approach to avoid Paul and Siegert must identify a 'plus' other than the indictment, trial, and related events for which the defendants possess absolute prosecutorial immunity." Id. at 798.

Therefore Rehberg failed to satisfy Paul's "stigma-plus" test and fails to allege a constitutional claim based on the press statements. This lack of a constitutional claim means Burke receives qualified immunity for his press statements. The district court erred by not finding Burke immune for the allegations in Count 8.

## VI. COUNT 10 – CONSPIRACY

Count 10 alleges Hodges, Burke, and Paulk engaged in a conspiracy to violate Rehberg's constitutional rights under the First, Fourth, and Fourteenth Amendments.

"A person may not be prosecuted for conspiring to commit an act that he may perform with impunity." Jones, 174 F.3d at 1289 (citations omitted). A prosecutor cannot be liable for "conspiracy" to violate a defendant's constitutional rights by prosecuting him if the prosecutor also is immune from liability for actually prosecuting the defendant. Rowe, 279 F.3d at 1282. And a witness's absolute immunity for testifying prevents any use of that testimony as evidence of

46

the witness's membership in an unconstitutional conspiracy prior to his testimony. Id.; Mastroianni, 173 F.3d at 1367.

Rehberg's conspiracy allegations do not enlarge what he alleged previously in his complaint. This opinion has already explained why Hodges, Burke, and Paulk receive absolute or qualified immunity for all of the conduct alleged in Counts 6 and 8 and why Hodges receives absolute immunity for the retaliatory prosecution in Count 7. Rehberg cannot state a valid conspiracy claim by alleging the Defendants conspired to do things they already are immune from doing directly.

The only portion of Count 7 that remains is Rehberg's retaliatory prosecution claim against Paulk alone. The intracorporate conspiracy doctrine bars conspiracy claims against corporate or government actors accused of conspiring together within an organization, preventing Rehberg's claim that Paulk "conspired" to initiate a retaliatory prosecution. Dickerson v. Alachua County Commission, 200 F.3d 761, 767 (11th Cir. 2000) ("[I]t is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself"); Denny v. City of Albany, 247 F.3d 1172, 1190 (11th Cir. 2001) (applying intracorporate conspiracy doctrine to city, city fire chief, and city manager). Rehberg has not alleged that

47

Paulk conspired with anyone outside of the District Attorney's office. See Denny, 247 F.3d at 1191 ("the only two conspirators identified . . . are both City employees; no outsiders are alleged to be involved"). The "conspiracy" occurred only within a government entity, and thus the intracorporate conspiracy doctrine bars Count 10 against Paulk. The district court erred in not dismissing Count 10.

## VII.  CONCLUSION

For the reasons explained above, Hodges and Paulk receive absolute immunity for Paulk's grand jury testimony and for the related pre-indictment conspiracy conduct alleged in Count 6; Hodges and Paulk receive qualified immunity for the issuance of subpoenas alleged in Count 6; Hodges receives absolute immunity for initiating a retaliatory prosecution as alleged in Count 7; Hodges and Paulk both receive qualified immunity for the retaliatory investigation alleged in Count 7; Burke receives absolute immunity for the allegations in Count 8, except for the alleged media statements, for which he receives qualified immunity; and Count 10's conspiracy claim fails. The only surviving claim from this appeal is the retaliatory-prosecution claim in Count 7 against Paulk, for which the district court correctly denied absolute and qualified immunity. We reverse the district court's order in part and remand this case for the district court to grant the Defendants' motions to dismiss and to enter judgment in favor of all Defendants on

48

Counts 6, 7, 8, and 10, except for the retaliatory-prosecution claim against Paulk in Count 7.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**